IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHN DUNLAP, | : | CIVIL ACTION |
|     Plaintiff | : | |
| | : | |
| v. | : | NO. 08-2019 |
| | : | |
| MERRITT HOSPITALITY, | : | |
|     Defendant | : | |

**M E M O R A N D U M**

**STENGEL, J.**                                                                                      **March 18, 2009**

      A hotel employee who was discharged after engaging in a fight while on duty alleges that he was terminated because of his race. Mr. John Dunlap was a Merritt Hospitality employee working at the Westin Hotel in Philadelphia, Pennsylvania. On August 27, 2007, while assisting the hotel's security personnel in moving a barricade, Mr. Dunlap found himself in a violent altercation with members of "the public." He was fired. Mr. Brian Fraim, one of Mr. Dunlap's co-workers, was allegedly involved in the confrontation as well but was not fired, suspended, or otherwise disciplined. Mr. Dunlap is African-American; Mr. Fraim is Caucasian.

      Mr. Dunlap filed this Section 1981 claim[1] alleging that he was discharged because of his race. (See generally Compl. (Document #1) (discussing the scope and facts of Mr. Dunlap's claim).) Merritt has moved for summary judgment on the primary grounds that

---

[1] 42 U.S.C. § 1981 states, in relevant part, "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens."

Mr. Dunlap has failed to establish his *prima facie* case. (See Def.'s Mem. for Summ. J. (Document #22).) Upon consideration of the parties' memoranda, I will grant the motion.

**I. Background**

The parties agree on many of the facts in this case. Because Mr. Dunlap's response to Merritt's Statement of Undisputed Facts mostly consists of unqualified admissions, the following narrative is largely drawn from the defendant's document. Where Mr. Dunlap has qualified his admission or otherwise denied Merritt's statement, however, his version of the facts (as the non-movant) is presented.

Mr. Dunlap was hired by Merritt in November 2005 to work as a Banquet House Attendant at the Westin Hotel in Philadelphia, Pennsylvania. (Def.'s Statement of Undisputed Facts ¶ 1 (Def.'s Ex. E).) His primary duties were to "[set] up and [perform] various banquet functions at the hotel including private parties and weddings." (Id.) His day-to-day duties would sometimes vary depending on the hotel's needs. (Id. ¶ 2.) Previously, he worked as a "Service Express Attendant" and as "Security." (Id.) As a Service Express Attendant, Mr. Dunlap reported to Mr. Adi Altman, and his duties included "greeting guests at the front door of the hotel, valeting cars, and bringing luggage to the bell staff." (Id. ¶¶ 3–4.)

**a) Mr. Dunlap's training and understanding of corporate policies**

Mr. Dunlap received formal and on-the-job training as a Merritt employee. (Id. ¶ 5.) These also included guest service and security issues. (Id.) On the guest service

front, he was trained "to be self-aware and manage his emotions when dealing with guests."[2]  (Id. ¶ 6.)  He was instructed that yelling and screaming were improper when dealing with an unruly guest.  (See John Dunlap Dep. 49:11–24, Nov. 13, 2008 (stating that Mr. Dunlap knew it was inappropriate to use threats and vulgar language with a guest) (Pl.'s Ex. A).)  The scope of Mr. Dunlap's training on security issues, however, was limited and did not include "any training specifically geared towards security personnel, such as restraints, holds, crowd control or similar topics."  (Pl.'s Resp. to Def.'s Statement of Undisputed Facts ¶ 5 (Document #31).)

    Mr. Dunlap knew and understood Merritt's workplace policies.  He knew that the Rules of Conduct contained in the Employee Handbook expressly prohibited employees from "being discourteous, unprofessional, or verbally or physically abusive towards other associates, guests and other individuals."  (Def.'s Statement of Undisputed Facts ¶ 10.)  Mr. Dunlap was aware of the Workplace Violence Policy, which expressly prohibited any acts or threats of violence or the possession of weapons of any kind.  (Id. ¶ 12.)  He was also familiar with the company's Progressive Discipline Policy, which described the disciplinary actions the company might take against employees.  (Id. ¶ 14.)  This policy included a provision allowing for Merritt to terminate an employee for a first offense.  Mr. Dunlap signed an acknowledgment that he read and understood all these policies.  (Id. ¶ 13.)

---

[2] By his response of "Admitted," Mr. Dunlap agrees that he received training on how to deal with guests in a courteous and professional manner.  (See Pl.'s Resp. to Def.'s Statement of Undisputed Facts ¶ 6.)

**b) The incident occurring on August 27, 2007**

On August 27, 2007, the New York Mets baseball team was staying at the hotel. (Id. ¶ 19.) A crowd of fans and autograph seekers formed on the sidewalk in front of the hotel and by the team's charter bus. (Id. ¶ 20.) Sterling James and Jewel Chowdhury, two of the hotel's in-house security personnel, were on duty.

When sports teams stayed at the hotel, it was not uncommon for employees in other departments to be temporarily reassigned to assist security personnel. (Id. ¶ 21.) At the time, Mr. Dunlap was working and dressed as a Service Express Attendant at the front door. (Id. ¶ 24). Mr. Altman asked him to help move a metal barricade onto the sidewalk in front of the hotel to create a path for the team. (Id. ¶ 28). As Mr. Dunlap began to move the barricade, he asked the gathered fans to step back. (Id. ¶ 30.) One of the fans responded to Mr. Dunlap that if he hit him with the barricade, he was "going to [expletive] [Mr. Dunlap] up." (Id. ¶ 31.) Mr. Dunlap responded in kind and threatened to "knock [the fan] out." (Id. ¶ 32.) A second fan got involved and told Mr. Dunlap, "I bet you won't knock me the [expletive] out." (Id. ¶ 33; Dunlap Dep. 49:15–17.) Mr. Dunlap responded in the same way and said, "[I]f you put your hands on me, I'm going to knock you the [expletive] out." (Def.'s Statement of Undisputed Facts ¶ 34; Dunlap Dep. 49:17–18.) By this point, the Mets' charter bus driver and Mr. Altman had come over to break up the confrontation. (Def.'s Statement of Undisputed Facts ¶¶ 37–38.)

Unfortunately, words gave way to action when one of the fans punched Mr. Dunlap in the face. (Id. ¶ 39.) Mr. Dunlap then ran across the hotel driveway back to the

front door; he estimated that he was then approximately twenty feet away from the fans. (Dunlap Dep. 53:3–20.)  From a storage closet by the front door, he retrieved a three-to-four foot metal rod.  (Def.'s Statement of Undisputed Facts ¶ 40.)  Mr. Dunlap felt threatened by the fans and was motivated by a desire to defend himself.  (Pl.'s Resp. to Def.'s Statement of Undisputed Facts ¶ 40.)  Messrs. Altman and Chowdhury tried to restrain Mr. Dunlap on the driveway, but he ran around them back to the sidewalk.  (Def.'s Statement of Undisputed Facts ¶¶ 43–44.)  Mr. Dunlap ran around the charter bus, and as he rounded the front of the bus, he saw the fan who had punched him standing a short distance from him.  (Id. ¶ 45.)  The fan had been running in Mr. Dunlap's direction, but when he saw Mr. Dunlap, he turned to run away.  Mr. Dunlap gave chase and hit the fan in the back with the rod.  (Id. ¶¶ 46–47.)

   The fan turned around and began to wrestle Mr. Dunlap.  (Id. ¶ 50.)  Other Mets fans joined in this struggle, and Messrs. Altman, Fraim, and James came over to break up the fight.  (Id. ¶ 51.)  They were able to pull Mr. Dunlap away from the fracas, but he then ran back to the storage closet by the hotel's front door to retrieve a second metal rod.  (Id. ¶ 54.)  Mr. Fraim was able to restrain Mr. Dunlap from re-engaging the fans and placed the rod back into the storage closet.  (Id.  ¶¶ 56–57)  Mr. Dunlap went back to the storage closet, retrieved the same metal rod, and began to pace back and forth in the hotel driveway.  (Id. ¶ 58.)  Mr. James took back the rod and placed it back into the storage closet again.  (Id. ¶ 59.)  Mr. Dunlap was then told to stay inside the hotel.  (Id. ¶ 60.)

Mr. Dunlap was not the only Merritt employee to be hit.  When Mr. Fraim went over to help Mr. Dunlap, he was punched in the back of the head by one of the Mets fans.[3]  He then grabbed one of the men, and got into "a small wrestling match."  (Fraim Dep. 8:20–23.)  Although Mr. Fraim claims he did not punch anyone (id. 8:24–9:2), Mr. Dunlap has said that he saw Mr. Fraim strike a fan and that Mr. Fraim had told him he had done so (Pl.'s Opp'n Mem. at 7 (Document #27); see also Dunlap Dep. 62:23–63:16 (stating that Mr. Fraim had told Mr. Dunlap that he had punched one of the fans)).

When Mr. Dunlap was finally taken into the hotel, he was escorted to a conference room; Mr. Fraim was also in the room.  (Def.'s Statement of Undisputed Facts ¶¶ 61, 63.) Philadelphia police officers arrived shortly thereafter to arrest the individual who had been using a metal rod.  They handcuffed Mr. Dunlap and charged him with multiple offenses ranging from aggravated assault to making terroristic threats with the intent to terrorize another.  (Id. ¶¶ 62–64; see also Criminal Compl. filed against John Dunlap, Aug. 27, 2007 (Def.'s Ex. H).)

Merritt began an internal investigation of the events.  Ms. Sharon Marx, the director of human resources, and Mr. Mike Manzari, the general manager, viewed video

---

[3] Mr. Fraim testified,
        Q.:    [Mr. Vance] So you saw a fan punch Mr. Dunlap?
        A.:    [Mr. Fraim] Yes, I did.
        Q.:    Then you – –
        A.:    Proceeded to the street.
        Q.:    Then another fan punched you?
        A.:    Yes.
        Q.:    Where were you punched?
        A.:    In the back of the head.
(Brian Fraim Dep. 8:10–18, Nov. 26, 2008 (Pl.'s Ex. B).)

security footage from the front door area, obtained a written statement from Mr. Altman, received an incident report from Mr. Chowdhury, met with Mr. Fraim, and spoke briefly with Mr. Dunlap.  (Def.'s Statement of Undisputed Facts ¶¶ 65–71.)  Mr. Dunlap was not asked to present his version of the events (Pl.'s Resp. to Def.'s Statement of Undisputed Facts ¶¶ 70–71).

After review of these relevant materials, Ms. Marx and Mr. Manzari concluded that Mr. Dunlap had acted in a violent, offensive manner (Def.'s Statement of Undisputed Facts ¶ 73) in violation of corporate policies (id. ¶ 72), and should be terminated (id. ¶ 72).  Mr. Dunlap acknowledged that he had violated Merritt's policies.  (Id. ¶ 74.)  On August 29, 2007, Mr. Manzari notified Mr. Dunlap that his employment had been terminated.  (Id. ¶ 75.)

Mr. Fraim was not disciplined for his role in the fight.  (Pl.'s Resp. to Def.'s Statement of Undisputed Facts ¶ 72.)  When asked why, Ms. Marx testified that she had no prior knowledge that Mr. Fraim had wrestled with one of the fans.  (Sharon Marx Dep. 31:23–32:9, 44:5–10, Nov. 26, 2008 (Pl.'s Ex. C).)  Mr. Fraim had only told her that he had been punched.  (Id. 32:18–19.)  Neither Mr. Altman's statement nor Mr. Chowdhury's report discussed Mr. Fraim's involvement in any further detail.  (Id. 32:3–33:10.)

**II. Standard of review**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  An issue is "genuine" when a reasonable jury could return a verdict for the non-moving party based on the evidence in the record. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute is "material" when it could affect the outcome of the case under the governing law. Id. A party seeking summary judgment initially bears responsibility for informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial Celotex burden can be met simply by demonstrating "to the district court that there is an absence of evidence to support the non-moving party's case." Celotex, 477 U.S. at 325.  After the moving party has met its initial burden, "the adverse party's response, by affidavits or otherwise as provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e).  Summary judgment is therefore appropriate when the non-moving party fails to rebut by making a factual showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

Under Rule 56 of the Federal Rules of Civil Procedure, the court must view the evidence in the record in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. Anderson, 477 U.S. at 255. The court must decide not whether the evidence unmistakably favors one side or the other, but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. Id. at 252. If the non-moving party has produced more than a "mere scintilla of evidence" demonstrating a genuine issue of material fact, then the court may not credit the moving party's version of events against the opponent, even if the quantity of the moving party's evidence far outweighs that of its opponent. Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

**III. Discussion**

Where direct evidence of discrimination has not been presented, the proper framework for analyzing a race discrimination claim in the employment context is found in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Coulton v. Univ. of Pa., 237 Fed. Appx. 741, 747 (3d Cir. 2007) (applying the McDonnell Douglas test to a Section 1981 race discrimination claim). Under that test, the plaintiff bears the initial burden of establishing the *prima facie* case. To do so, the plaintiff must show that he or she (1) is a member of a protected class (2) who had satisfactorily performed the duties required of his or her position, (3) but was discharged or subjected to some other adverse employment action, (4) while similarly situated persons not of the protected class were

treated more favorably.  McDonnell Douglas, 411 U.S. at 802; Jones v. School Dist. of Phila., 198 F.3d 403, 410 (3d Cir. 1999).  When the plaintiff has established these elements, the burden then shifts to the employer to provide a legitimate, non-discriminatory reason for the adverse action.  Jones, 198 F.3d at 410.  Once such an explanation is provided, the burden shifts back to the plaintiff who must then prove by a preponderance of the evidence that the employer's proffered reasons are a pretext for discrimination.  Id.

I will grant Merritt's motion.  I find that Mr. Dunlap has failed to set forth the *prima facie* case for his race discrimination claim.  Even if he had done so, he has not proven by any measure that Merritt's stated reasons were pretextual.

**a) Mr. Dunlap failed to establish the *prima facie* case**

The first three elements of Mr. Dunlap's claim—that he is (1) a member of a protected class (2) who had been satisfactorily performing his duties, and (3) was discharged—have not been contested.  I will not consider them to be in dispute.

The question is whether Mr. Fraim is a similarly situated comparator for Mr. Dunlap's claim, and I find that he is not.  This element requires the plaintiff to demonstrate that "the other employee's acts were of 'comparable seriousness' to his own infraction."  Anderson v. Haverford Coll., 868 F. Supp. 741, 745 (E.D. Pa. 1994) (quoting Lanear v. Safeway Grocery, 843 F.2d 298, 301 (8th Cir. 1988)); accord McCormick v. Allegheny Valley Sch., 2008 WL 355617, at *11 (E.D. Pa. Feb. 6, 2008); Bailey v. Reading Hous. Auth., 2005 WL 1006265, at *2 (E.D. Pa. Apr. 29, 2005); Crumpton v.

Potter, 305 F. Supp. 2d 465, 472–73 (E.D. Pa. 2004).  To be considered "similarly situated," the comparator must have "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."  Anderson, 868 F. Supp. at 745 (quoting Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992)).  Other aspects of the comparator's employment should be similar.  See, e.g., Crumpton, 305 F. Supp. 2d at 473–74 (finding that the comparator was not similarly situated because she was still in training but the plaintiff was a seasoned employee).

Mr. Dunlap favors a more general analysis that would hinge only on whether Mr. Fraim violated the Workplace Violence Policy  (See Pl.'s Opp'n Mem. at 7 ("[Mr. Fraim's] admitted physical contact [with the Mets fan] clearly falls within defendant's Workplace Violence policy because it constitutes aggressive physical contact.").)  At the least, Mr. Fraim's wrestling constituted "aggressive physical contact" that violated Merritt's Workplace Violence Policy; if Mr. Fraim had punched one of the fans, then that would undoubtedly be prohibited physical contact.  (Pl.'s Opp'n Mem. at 7.)  Under this argument, Mr. Fraim is similarly situated due to the simple fact that he too violated the policy by wrestling or possibly punching a fan.  He, however, was not fired, suspended, or otherwise disciplined.

This view disregards the precise language that courts in this district have adopted for determining whether a comparator is similarly situated.[4]  Jones v. Hospital of

---

[4] My ruling should not be read as requiring the plaintiff to prove every single similarity between himself or herself and the comparator.  I believe that such an exacting standard would defeat the purposes of this and other civil rights statutes by placing too onerous a burden on potential plaintiffs.  Cf. Swierkiewicz v.

University of Pennsylvania provides a useful illustration of the analysis of this language. 2004 WL 1773725 (E.D. Pa. Aug. 5, 2004) (Surrick, J.).  In Jones, the court granted the employer's motion for summary judgment after determining that the plaintiff had failed to establish a *prima facie* case of discriminatory discharge.  Id. at *1–2.  The plaintiff was employed as a night shift patient care observer, and she was fired after she fell asleep while performing a one-on-one observation of a suicidal patient.  Id. at *1.  She alleged that she was discharged because she was pregnant at the time.

In Jones, the court granted summary judgment for the employer upon concluding that the plaintiff had failed to present a similarly situated comparator.  Id. at *4.  Though the plaintiff had produced evidence of other employees who had fallen asleep during work hours, they were sleeping during scheduled breaks, not while on suicide watch.  Id. at *6.  Even after assuming that sleeping while on a break was a violation of the employee's policies, the court concluded that the qualities of that infraction were quite different from the plaintiff's.  Similarly, a worker found reading a magazine while performing a one-on-one observation was not similarly situated due to the inherently different nature of the violation and the fact that the patient's wife was also present during that time.  Id. at *7.

---

Sorema N.A., 534 U.S. 506, 512–515 (2002) (finding the Second Circuit's heightened pleading standard for employment discrimination cases as conflicting with the simplified notice pleading standard set forth in Federal Rule of Civil Procedure 8(a)).  Discrimination cases necessarily involve a fact intensive inquiry, which makes them not amenable to a bright line rule of proof.  These considerations aside, however, the court can properly expect the plaintiff to demonstrate (and support with adequate facts) how similarly situated the comparator is with respect to their conduct, duties, and other relevant considerations.  Mr. Dunlap falls short.

Here, it is clear that Mr. Fraim is not similarly situated to Mr. Dunlap. No reasonable jury could find that Mr. Fraim's conduct remotely approached the severity of Mr. Dunlap's. For the purposes of this memorandum, I assume that Mr. Fraim's actions violated Merritt's policies, but I still do not find that Mr. Fraim was similarly situated.

The plain facts show how different these men's actions were. In the case of Mr. Fraim, he "wrestled" with one of the Mets fans. (See Fraim Dep. 8:20–23 ("Another guy grabbed me from the back and then it kind of turned into a small wrestling match between me and one person.").) He did not threaten or use any other vulgar language. (Def.'s Reply at 2.) He got involved when he tried to defuse the situation by separating the individuals and later taking away Mr. Dunlap's rod. (Def.'s Mem. for Summ. J. at 6.) It was after he was punched in the head that Mr. Fraim, acting in self-defense, wrestled an individual to the ground. (Id.) Whether he punched one of the fans is a fact still in dispute.[5]

---

[5] Mr. Dunlap has presented no additional evidence on this point in addition to his own allegations:
    Q.:    [Mr. Janson] [Mr. Fraim] didn't punch anyone, correct?
    A.:    [Mr. Dunlap] Yes.
    Q.:    Yes?
    A.:    Yes, he did punch someone.
(Dunlap Dep. 60:19–24.)
    In a later part of the same deposition, Mr. Dunlap's testimony reads as follows:
    Q.:    Besides your own statement, do you have any evidence that Brian Fraim punched another–punched another Mets fan or any other person out there?
    A.:    Brian himself.
    Q.:    Brian told you this?
    A.:    Yes.
        *    *    *
    Q.:    And he told you he punched somebody?
    A.:    Yes. He said he had got hit and he swung back.
    Q.:    He said he swung back. Did he say if he hit that other person?
    A.:    Yes.
(Id. 62:23–63:4, 63:11–16.)
    Mr. Fraim's testimony points the other way:

On the other hand, Mr. Dunlap used profanity and made threats despite knowing it was inappropriate to do so. (See Dunlap Dep. 48:4–50:12.) After being attacked, his seeming retreat was actually an attempt to retrieve a metal rod. (Def.'s Statement of Undisputed Facts ¶ 40.) Whether this was done for defensive or offensive purposes is immaterial because Mr. Dunlap then eluded the Merritt employees trying to restrain him and ran back *towards* the fans. (Id. ¶ 43.) When Mr. Dunlap ran *around* the charter bus and found the fan who had punched him, he hit the man in the back as he was trying to run *away*. (Id. ¶¶ 46–47.) Even after being pulled away, Mr. Dunlap tried to get another metal rod two more times. (Id. ¶¶ 55, 58).

These two sets of conduct can hardly be described as similar. It is without question that Mr. Dunlap's actions were of a wholly different character than even the worst alleged conduct by Mr. Fraim. Mr. Dunlap was an active aggressor who ran back to a fight scene. He used a dangerous weapon to hit a person. Two more times, he retrieved the same or a similar weapon, and Merritt employees had to take it away from him. There is no genuine issue of material fact that Mr. Fraim is not a suitable comparator. Thus, I find that Mr. Dunlap has failed to establish his *prima facie* case.[6]

---

> Q.: [Mr. Vance] Did you throw any punches during your confrontation?
> A.: [Mr. Fraim] No, I did not.
>     \*    \*    \*
> Q.: Now, did you tell Mr. Dunlap that you had punched one of the fans?
> A.: I don't recall.

(Fraim Dep. 8:24–9:2, 12:10–12.)

[6] The McDonnell Douglas test is not the only way for the plaintiff to proceed. In Swierkiewicz v. Sorema, the Supreme Court noted that "if a plaintiff is able to produce direct evidence of discrimination, he may prevail without proving all the elements of a *prima facie* case." 534 U.S. at 511. Mr. Dunlap has already stated, however, that there is no direct evidence of discrimination in this case and that the McDonnell Douglas test was proper. (Pl.'s Opp'n Mem. at 5.)

**b) Mr. Dunlap has not demonstrated that Merritt's explanation is pretextual**

Even assuming that Mr. Dunlap succeeded in presenting the *prima facie* case, his claim should be dismissed because he has not demonstrated that Merritt's explanation is pretextual. Merritt has articulated what it believes to be legitimate, nondiscriminatory reasons for its actions: Mr. Dunlap's conduct was a "serious and egregious" violation of its policies, such as the Rules of Conduct and the Workplace Violence Policy. It was aggressive, violent, and created a great risk of harm to guests of the hotel. Mr. Dunlap was, in fact, arrested for his criminal conduct. (See Def.'s Mem. for Summ. J. at 9.)

The burden now shifts back to the plaintiff to demonstrate that the defendant's explanation is pretextual. He or she must "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 644 (3d Cir. 1998) (quoting Fuentes v. Perksie, 32 F.3d 759, 764 (3d Cir. 1994)). The plaintiff is not necessarily required to produce additional evidence, but he or she must point out the "weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them 'unworthy of credence,' and hence infer 'that the employer did not act for [the asserted] non-discriminatory reasons.'" Fuentes, 32 F.3d at 764–65.

Mr. Dunlap has presented three explanations as to why Merritt's stated reasons are pretextual. None is persuasive. First, he believes the fact that he is Black and Mr. Fraim is White makes Merritt's explanation inherently questionable. This argument might have some traction if race were truly the only difference between the men, but it is not. The discussion above regarding Mr. Dunlap's *prima facie* case already well covers the vast differences between them and their conduct.

Second, he believes that Ms. Marx's claim that she did not know of Mr. Fraim's involvement "strains credulity." (Pl.'s Opp'n Mem. at 8.) He contends that it would be ludicrous to believe that no one ever mentioned Mr. Fraim's wrestling. This argument is nonsensical. The most I gather is from this apparent silence is that nothing was said. I see no reason to draw any negative inferences. The bulk of Ms. Marx's investigation was focused on the employee who had used a metal rod to hit a person on the sidewalk. Understandably, the statements collected in conjunction with the investigation were more concerned with Mr. Dunlap than Mr. Fraim. In the absence of any evidence besides Mr. Dunlap's own speculation that Ms. Marx had to have known of Mr. Fraim's involvement, I will dismiss this argument.

Third, he points out that Ms. Marx never asked him for his version of the events. (Pl.'s Opp'n Mem. at 9.) One would hope that a person placed into the role of investigator would strive to gather information from all relevant sources. Mr. Dunlap, as the subject at the center of the incident, would no doubt be such a source. Although Ms. Marx's failure to provide Mr. Dunlap an opportunity to tell his side might be

procedurally unfortunate, it does not throw her decision to terminate him into question. Ms. Marx's deposition testimony makes it clear that the company believes "[there is] no acceptable reason to pick up a weapon" as Mr. Dunlap did. (See Sharon Marx Dep. 42:24–43:1.) The statements made by Mr. Dunlap's co-workers and the security footage from the hotel's driveway area unmistakably indicated that "[when Mr. Dunlap] could have decided to walk away . . . [h]e decided to pick up a weapon . . . ." (Id. 41:19–21.) A discussion with Mr. Dunlap may have revealed what happened in the time before he was attacked, but Ms. Marx's testimony makes it clear that there was no acceptable justification for his actions. The fact that Mr. Dunlap was never able to present his side of the events is wholly inconsequential.

Mr. Dunlap has not demonstrated that Merritt's explanation was a pretext for discrimination. His arguments are almost exclusively composed of his own blanket allegations and are unsupported by any substantial evidence. Nor has he presented any direct evidence of overt discrimination on Merritt's part. In light of the fact that Mr. Dunlap has again failed to carry his burden at this phase of the McDonnell Douglas test, I will grant Merritt's motion for summary judgment.

**IV. Conclusion**

For the foregoing reasons, I will grant the motion for summary judgment. An appropriate Order follows.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JOHN DUNLAP,** | : | **CIVIL ACTION** |
| **Plaintiff** | : | |
| | : | |
| v. | : | NO. 08-2019 |
| | : | |
| **MERRITT HOSPITALITY,** | : | |
| **Defendant** | : | |

## O R D E R

**STENGEL, J.**

**AND NOW**, this 18th day of March, 2009, upon consideration of the defendant's Motion for Summary Judgment (Document #22) and the plaintiff's response thereto, it is hereby ORDERED that the motion is GRANTED.

The Clerk of the Court shall mark this case CLOSED for all purposes.

BY THE COURT:

/s/ Lawrence F. Stengel
LAWRENCE F. STENGEL, J.